Our next case is number 21-1458, John Doe v. Princeton University. Mr. Bowen. May it please this court. My name is Michael Bowen. I'm counsel for the appellant, John Doe, and I'd like three minutes for rebuttal. Granted. Thank you, Your Honor. Your Honor, this case and the decision, the analysis and the holding of this court's ruling in the U Sciences decision a year ago requires reversal of the district court's dismissal of this Title IX action, both on the Title IX claim and on the state law breach of contract claim. Can we start with the panel decision? Is it your argument that the district court was not allowed to consider the panel decision? No, Your Honor. Our argument is that the district court misread or misrelied on the panel decision. It was okay to refer to the panel decision for the fact that it existed and the fact that that process occurred. But what the court did in our view that was error was it took as truth and truth that superseded the well-pled allegations of the complaint certain findings of fact that were made by the panel. And that was. What are those findings of fact? Well, there were two broad categories. One is that they found that Jane Doe had no motive to lie. And the well-pled allegations in the complaint was that she did have a motive to lie. And that motive to lie was based on the stalking allegations that the panel never investigated. And Princeton University disregarded because it was made by the male plaintiff. What paragraphs in your complaint did you allege that she had a motive to lie? And what exactly did you say? Did you allege about that? Well, we we alleged. That she really goes over just read the numbers. The pair read that tell me what the number is and read the allegation. Well, the paragraph that I'm referring to is paragraph 34 refers to the stalking allegation. What does this just read it? What does it say? This paragraph reads, in part, Jane's harassment and spreading of rumors about plaintiff eventually gained traction on campus. Plaintiff's reputation at the university began to suffer. And then plaintiff voiced his concerns in an email to the residential college's director of student life, Mr. Meigs, who was responsible for upholding good conduct and investigating and adjudicating disciplinary proceedings. Plaintiff reported that he was being harassed by his ex-girlfriend who, in response to their breakup, was spreading false information to malign him. And he advised that he simply didn't feel safe. So plaintiff, you're alleging their plaintiff was spreading false information about him. That's correct, Judge. And in the preceding paragraphs, it goes into great detail about what the comments were and that the female accuser was telling plaintiff that she was going to use instances in which they had consensual but rough sex, including consensual choking activity, against him and claim that that was a physical abuse and it was against her consent, which was not true. So she made those statements as a threat and basically told him that if you take a gap year and you leave the campus, then you won't have a problem here. So she was making the threats and making extortionate demands that he respond to the threats. And the fair inference from the complaint, the paragraphs I referred to and the rest of the complaint, is that was all false. And so her motive to lie, she carried through the threat. When she filed her complaints with the panel, she was making good, making false claims to put what had been consensual, albeit physical activities, in a false light and claim that they were non-consensual. Okay. All right. What else in the panel opinion is inconsistent with your well-pleaded allegations? Well, we also pled that the panel did not credit any of the male accused witnesses. But that can't help your gender claim because they credited, they took testimony from a lot of witnesses, 16, I think, male and female, and there was no sort of gender distinction between credibility. The only real distinction that I could find on credibility, because all the witnesses were deemed credible, was that your client, in some respects, was deemed not credible or partially credible. So what I'm concerned about is it can't be enough, can it, for a Title IX claim to say that any time a man loses or a woman loses, that it's gender discrimination because you picked one over the other. Correct. Then every single disputed case would be a Title IX violation, right? So help me with that. Well, I agree, Judge, and that's not our position. But our position is a slight variation on the Baum decision, which was, in that case, they held that because the university disregarded or discounted all of the male witnesses and credited all the female witnesses, that was a basis to infer discrimination based on sex. Here what we're saying is the panel disregarded all of the witnesses that testified favorably for the male. But some of them were his, were women. One was his mother. Correct. And the panel didn't... But it's not a gender discrimination issue. Well, it's a gender discrimination issue because the panel made the decision about who to credit based on where the test, to whom the testimony was favorable. So if the testimony was favorable to the male party, they disregarded it in toto. Now, I know that they said that they found these other witnesses to be generally credible, but this is an example of relying on a panel decision of fact. But did they find his mother not credible? It's not about the mother's testimony at all, Judge. There's nothing in the panel report about it at all. How can you say that they found all of his witnesses not credible, that they were... Because if you look at the substance of what his witnesses said, in order to find them credible, they would have had to found, would have had to have ruled that the female accuser had committed physical acts of violence against a male. Because his witnesses, he had one male friend who testified about seeing him contemporaneously after an interaction with the female accuser and seeing him physically injured and then learning that that was caused by the female. If that testimony had been credited, then the panel would have had to find that the female accuser had committed an act of violence against the plaintiff, and it didn't do so. And similarly with the mother, the mother also testified that she was witness to physical injuries to her son after seeing him with Jane Doe, Jane Roe, excuse me. And she also testified that she had evidence that those injuries were caused by the female accusers. Again, there's no mention of the mother whatsoever anywhere in the panel report, and there's no mention of the contemporaneous male witnesses' view of the injuries to the plaintiff and the fact that it came from the female accuser. So just because they blanketly say that they credited all witnesses, in fact, we have well-plaid specific allegations that they did not do so, because had they done so, they would have had to have found the female accuser responsible for some acts of physical violence against the plaintiff. And so just to make sure I understand your claim, your claims, I hear you saying that sort of the fix was in. Everything that happened in front of the panel was predetermined to run counter to your client's pre-determined defense and his allegations. Correct. And that that was because of his sex and breached their contractual obligations to him. Are you also arguing that the way the case was initiated supports Title IX violation and a breach of contract? Yes. Or are you focused exclusively on the conduct of the hearing? Both, both the initiation and the conduct of the hearing, because in this case, like in U Sciences, there were facts known to the university that the female accuser had also breached the policy, the misconduct policy of the school, and in fact, the sexual misconduct policy of the school, including stalking, which is part of the same policy that the panel was investigating in terms of the sexual violence. I don't remember you pleading, stalking. I mean, one of my concerns about your argument is that some of the things you say in your brief don't map quite exactly on your complaint, and you had an opportunity to re-plead, and you didn't re-plead. So some of the things in your brief you could have put into an amended complaint, but you never did that. So I can't really accept some of the argumentation in your brief that's not found in the complaint. Well, the elements are there, Judge, because paragraph 34 says that the plaintiff went first, before there were any claims against him, to his advisor, Mr. Meggs, and made the claim that there were false statements being made about him, and he felt unsafe, and he asked for help of what to do. Mr. Meggs didn't give him any help. In paragraph 67 and 68 of the complaint, there's a definition of stalking from the policy that's specifically referred to in the complaint. So it's separated in paragraphs, but it's there. Paragraph 68 refers to the fact that anything that the school has notice of, no matter how it gets it, it has an obligation to conduct an investigation of it, if it's a potential violation of the policies. So paragraph 34, 67, and 68 kind of link that all together, and then paragraph 112 goes on to describe Mr. Meggs' obligations. One of his obligations was to direct students to the Title IX coordinator in appropriate cases, and he didn't do that. Now, it also turns out that Mr. Meggs became the advisor for the plaintiff throughout the entire rest of the proceeding. And in no time did Mr. Meggs advise him that you need to re-raise your stalking claim, or your claims about these false allegations being made against you. So I understand Your Honor's concern, but it is in the complaint. The pieces are there, and the fair emphasis is there. It sounds like you're arguing that there's sex discrimination because when your client complained to Meggs, Meggs didn't goad him or encourage him to file a formal complaint, but when Roe made an informal complaint, the opposite happened. That's correct, Your Honor, and we do plead that, that she was coaxed into filing a complaint while he was pretty much discouraged from filing a complaint. What's the evidence he was discouraged? Well, he was never advised that he had the opportunity to file a formal Title IX complaint for those set of incidents and conduct that occurred in that summertime period. And they actively referred him to seek some kind of mental or emotional counseling, so they kind of steered him away from Title IX, and that's in the complaint, that's in paragraph 34. So that's part of the fact that they treated him differently from the way they treated the female accuser. And then we have more than what happened in Youth Sciences, because this was actively reported to the school, to Mr. Meggs, by the plaintiff, before there was any allegation that he had done anything wrong. And then we have other incidents of disparate treatment, including the fact that he was banned from campus, but the female accuser was not banned from campus, even though she was also eventually accused of sexual assault. She was accused of similar types of violent physical acts. Well, you have to acknowledge, don't you, there's a difference between the no communication order and the no contact order? Yes, Judge. Mike, you were, in your briefing, you were sort of rendering those equivalent, and I didn't really buy that. Well, the one I was referring to was the ban from campus, so he was physically banned from activities on campus except for a small category of classified activities. That was the last form of participation that he could do, but that never happened to the female accuser, even though she was accused of the same kinds of infractions of intimate relationship violence. Those were the same types of conduct that the plaintiff had been accused of. He was banned and she wasn't, so that's one category, and then the breach of the no contact or the no communication was, her breach was a physical approach to him, right after that contact order, no contact order went into place. And she wasn't reprimanded for that, and his was an accidental social media, hitting a like button on some kind of social media account, and he was severely reprimanded for that. And so, again, it shows the disparity in the treatment, and if you run all of that through, any one of those may not be enough standing alone, but when you run all those through together, cumulatively, they're more than what was sufficient in youth sciences to say that there was a fair inference at this stage, because we're only at the pleading stage, that there was a fair inference of motivation based on his sex. Well, I've been sort of monopolizing the question, Judge Porter, do you have any questions at this time for Mr. Bowen? I don't think so, but let me just follow up on what you were asking. If a student approaches the university and says, this happened, but I'm not inclined to pursue it, and the university says, no, you can't pursue it. If a student approaches the university and says, well, we think it's serious, you should file a complaint, and then another student comes and says, this happened, I don't know what to do about it, and the university says nothing, is that a Title IX violation? It could be enough of a basis to infer a possible motivation based on sex, and at the pleading stage, that's all that's necessary for establishing a Title IX claim. Again, it's only because we're at the pleading stage that that would be sufficient, and it depends on the totality of the circumstances. And here, because those circumstances all slant against the male accused, it's sufficient to meet the youth sciences standard. That was articulated by this Court. So you're not saying that each of these things alone might be enough, but you put them all together, and it tips the balance? Yes, Your Honor, that's our position, and I think it's well supported by this Court's decision in youth sciences. And again, there's the institutional pressure aspect of it, too, which we haven't touched on, but that's in our brief. All right, we'll hear you on rebuttal. Thank you, Mr. Mann. Mr. Katzenberg. Unfortunately, Jeff Katzenberg is not my relative. May it please the Court, I'm Stephen Katzenberg from Ballard Sparr, and I'm here on behalf of Defendant Appelee, Princeton University. Your Honor, this case was considered and decided under the standards set forth in youth sciences, and is very much consonant with the rulings in that case. Here we have a panel that undertook a very thorough investigation. There were 16 individuals who were interviewed besides the respondent and the claimant, and there were, in addition, as the complaint describes it, a massive amount of non-testimonial evidence in the form of text messages, Facebook and other social media, messages and posts, voicemails, photos, and videos. There was an opportunity to review all the evidence by both Doe and Rowe. There were two interviews of each of Doe and Rowe, and there were written submissions by Doe and Rowe, and there was an appeal of which Doe availed. Including, on appeal, the right to raise any procedural unfairness that Doe perceived. Here, again, unlike in youth sciences, this wasn't just a question of a he said, she said situation. In addition to the multiple additional witnesses, the panel points to, and the judge below correctly refers to the panel decision for the process and decision-making processes that are described therein of the panel, not to accept any of the facts as true, but panel cites, amongst the other non-testimonial evidence, the three videos and pictures of Rowe, including a bloody nose, cut lips, choke marks, including Doe's voice and image on the videos, in addition to social media exchanges between Doe and Rowe. If we take cognizance of all that to conclude that Doe did, in fact, get a fair hearing and that there was ample evidence to suggest that there was a violation of the violence policy, so let's assume all that for a minute, what if there was evidence going the other way? That there was violence toward Doe, there was testimony to that effect, et cetera, and there was testimony that could have supported a finding of responsibility. I'm not saying there had to be a finding of responsibility, but there was at least evidence to support a finding of responsibility, wasn't there? There, I would not say that there was zero evidence going each way. What I would say, Your Honor, is that that is not the standard. The standard under New Jersey contract law is simply that there be... I'm focused on Title IX. If we agree that he had some evidence, and again, I'm assuming he's responsible, okay, so assume that, if there's evidence that she's responsible, but they find her not, why doesn't that raise an inference of sex discrimination, that the panel perhaps didn't put the same weight on his evidence that they put on her evidence charging him, because we've got charges going both ways here. Your Honor, if that's the level of pleading that's necessary for Title IX, then any time you have a male who loses out, or a female who loses out, that's a good thing. If they lose out, they will be able to assert a Title IX. The existence of some evidence is not enough. There has to be very much a plausible inference that there was gender bias at work here. Well, their argument is that the school was eager to encourage Roe to pursue claims, and there is evidence in the record that one of the women, or perhaps two of the women she spoke with mentioned that to her, and there's not evidence that Meigs did the same thing. So why doesn't that raise a plausible inference of sex discrimination? It does not, Your Honor, because even as pled in the complaint, there's not enough that's pled, because what's pled in the complaint is that in early September, Roe approached Ms. Crotty in the Title IX office to raise the issue that she had been subject to intimate violence, intimate relationship violence. The complaint also alleges that's alleged to be early September, and according to the panel decision, it was September 6th. There's also an allegation that sometime in September, not early September, Doe approached Mr. Meigs, his director of residence life, and raised the fact that there were rumors being spread by his former girlfriend. First of all, those are two entirely different levels of allegations, but moreover, the school did not do any investigation on the origin of either of those incidents until there were complaints asserted and a request for an investigation. But I thought in one instance versus the other, the school provided counseling that suggested a complaint would be appropriate and should be moved forward. Is that incorrect? The complaint does allege that Mr. Meigs advised that he see counseling, but it doesn't say why. It doesn't say anything suggesting that was a punishment, as opposed to the fact that the director of residence life had a student in front of him who was distressed. What we do know, Your Honor, because... But they also, the allegation is that the university encouraged one of the complainants to go forward with a formal action, but not the other. Well, Your Honor, I would say they encouraged both at different times. Let me add a couple of facts from the complaint, Your Honor, allegations from the complaint. First of all, on October 8th, or excuse me, it might be October 9th, according to the complaint, as well as the panel decision, Doe met, Doe, not Roe, met with Ms. Crotty as well, because Ms. Crotty wanted to inform Doe of the issues that have been raised by Roe. There's no allegation that in that meeting, Doe raised any concerns or any requests about the rumor spreading. So here he was meeting with someone from the Title IX office, and he did not raise this. Moreover, though, all sets of allegations that were raised by either party were investigated, and after both sides raised their sets of allegations, the university issued on December 12th a notice of charges, and they sent one to each of Doe and Roe. Hold on one second, how do we know that all the charges were investigated? There's no allegation by Doe anywhere that the charges that he raised were not investigated. Okay, so we know by negative implication, okay. And we also know from reviewing the panel, I mean, the panel memo does detail the process that it went through. It identifies all the charges, and it identifies their investigation and assessment. So we also know from that, but there's no allegation pertaining to that. But the university does solicit, the Title IX office and the panel does solicit Doe, because when they, in the notice of charges, they specifically call out to Doe, is there, these are the charges that you have raised, and that we are, allegations that we will investigate. These are the allegations against you that we will investigate. And then they go on to say very explicitly, are there any other facts or circumstances that you would like us to, that we should know about, or that we should consider investigating? And Doe never comes back and raises anything else. So Doe is solicited in a very formal way by the panel for any additional information, even after he's come forward, even after he's had two days of meetings,  I want to make sure I'm understanding this correctly. I thought that Doe alleged that the university informed Doe, excuse me, warned Roe that Princeton wanted Roe to take further action against the plaintiff. And the allegation is that was a recommendation that was never made to the plaintiff. And as a result, it's a plausible inference of bias. Now, whether it's proved or not is something different, but why is that not? Well, I think for several different reasons, Your Honor. Number one, because there was, in fact, an investigation into everything that Doe asked that there be an investigation. Number two. I understand, but you keep coming back, you're reiterating this point about asking for an investigation, and I understood the allegation to be there was never a suggestion that we should look into these things. Well, number two, Your Honor, I think there's a vast difference between a student going to their resident's life director and saying, I broke up with my girlfriend, and she's spreading rumors about me that are false, and someone coming in and saying, I've been the subject of physical violence, including strangling. Why is there a vast difference at the pleading stage? Because I think just taking those facts is true. It's certainly, a university would be entitled to say to the person who claims that they were the subject of physical violence on repeated occasions, you really should consider coming forward so that we can conduct an investigation. Does the university allow this kind of violence? One of your clubs seems to endorse it. Excuse me? I'm not familiar with that, Your Honor. Oh, I'm not sure what Your Honor is referring to. Roe participated in a sports team, but there was no suggestion of violence. I thought, I mean, one of the things that's very troubling, at least to me, about the case is that there's this notion that this kind of sexual violence can be consensual, but, I mean, I, you know, but your client said that, and his client said it, so I don't know. I mean, that's, I mean, I can't really speak to people's consensual sexual relations. Well, if that's the baseline, where do you go from there? I mean, where do you draw, I mean, I don't know. Well, I mean, the... It's relevant, right? I mean, I just heard this question. It's relevant because you're placing much on the allegations of violence, but the allegations of violence seem to then at least relate to some sort of consensual conduct, so how is it not relevant? Well, Your Honor, I'm not saying that the university or the independent panel here should have accepted her word, nor did they. Again, this is very different, again, from, for example, the USciences case, where there's lots of contemporaneous evidence. There's an email exchange, for example, with, between Roe and Doe, where Roe identifies some of the issues, and Doe responds, I'm sorry, I effed up, I know it's not okay. There's contemporaneous texting and conversations with a friend of Roe's about the incidents that are occurring and that they're not okay. I mean, in addition to all of the other evidence, including the acceptance of mail testimony of a friend of Doe's, a close friend of Doe's, as it's described, who was flatly inconsistent with Doe, and Doe's narrative of what occurred. And so there is a very deep investigation that occurred here, I mean, far deeper than, in my experience, most Title IX cases involved, and there's an immense amount of work in analysis. There's a lot of evidence of thoroughness and all that, but again, it's not the district judge's task at the Rule 12 stage to weigh the evidence or anything like that. I agree, Your Honor, but... In a strange way, the fact that this panel opinion from the investigatory panel of the university is part of the record, and Mr. Bowen, I assume you agree with Mr. Bowen, it was fair game for the district court to consider it, right? Absolutely, Your Honor. And I guess what I'm wrestling with, it's hard to consider a 25-page single-spaced report without making certain normative judgments about what's contained in the report, right? But this court and the court below don't need to second-guess and revisit de novo that assessment. And on the question of bias, and Your Honor, I mean, I don't want to keep repeating, but it is true that everything was investigated, and I don't think you can equate every conversation with a resident director about a girlfriend-boyfriend relationship in e-mail and rumor spreading with an accusation. I wanted to come back to that for a minute, because as alleged in the complaint, that conversation was a little more nuanced than it should have been. And it was a little more significant than just my girlfriend's complaining about me and I don't like it. According to the paragraph 34, he says he was being harassed, and he says he didn't feel safe. And in this context, you know, those are sort of magic words, aren't they? Well, I don't know that they're magic words, Your Honor, but as I said, Doe did meet with the Title IX office on October 9th, and there's no allegation that he raised this. There's no allegation that all of his allegations were not ultimately investigated by the Title IX. But what he met with them on the 9th, wasn't that when they asked him to come in so he could be told about what was being alleged against him? And if he had any concerns... That puts him in a negative posture. That puts him in a defensive posture, clearly, right? Well, I don't know... I don't know that he was being harassed, and he wasn't saying, hey, can I talk to you, which is what's alleged to have happened in September. So... So we should have confidence, or the district judge should have confidence, that if Doe in the first instance had gone to the Title IX office, they would have encouraged him to file a complaint against Roe. And if Roe had gone to her resident advisor, that resident advisor would have told her, well, go get some counseling. You know, the record is sort of clear that if we inverted the facts, that it would have been handled the same way. Well, Your Honor, that's not inverting the facts, because the facts also include one person coming in and saying, I was subject to repeated physical violence. And another person talking to a resident advisor about rumor spreading, but... It's just an awful lot of fact-balancing, counsel, all of which seems as though it's appropriate for a later disposition. But I'm struggling still to see why this is appropriate to dismiss at this early pleading stage. Because, Your Honor, I don't think that there is enough, even my opposing counsel has acknowledged that any one of these situations is probably not enough, in his own words, to constitute a plausible inference of sex bias here. And I don't think when you look at the totality of the circumstances here, Your Honor, which is as pled, not... I don't know how you can pull out this one thread and say that alone gives rise to sex bias. When there was this follow-on meeting, when every allegation that Doe raised was investigated, when the university wrote to Doe in the notice of charges and said, quote, if there are other prior interactions between you and the complainant counter-respondent that you believe violated university policy, that are not included in this letter, it is important that you notify me about them as soon as possible, and the panel will consider appropriate next steps. So Doe was also solicited, even after he had raised his allegations, is there anything else? And nor did the university proceed just based on Roe coming in to see them. In both cases, they required a request from the party, they investigated all of the requests from the party. And I just don't think, Your Honor, that pulling at that one thread, it sets the bar so low for a plausible Title IX allegation that any counsel will be able to come up with an allegation that will then be constituted plausible. And every single Title IX investigation will be subject to federal litigation. Because you can look at the detailed facts in each situation and find some tiny thread. That doesn't rise to the level of plausibility, Your Honor. Well, before Mr. Katzenberg's time's up, could we switch for a minute to the New Jersey claims, the state law claims? I'd be interested to know what you make of the distinction in the New Jersey cases, between the academic cases and the non-academic disciplinary cases. As I see it in the academic cases, there's a baseline, a fairness baseline, that the defendant is entitled to notice, an opportunity to examine evidence, and the ability to present his case to the decision-maker. That's the academic cases. And then the New Jersey cases seem to say that in the non-academic setting, the defendant's entitled to more than that baseline, but they don't really say what. Is that a fair reading of the cases? I actually think that there's, if you look at the cases that arise in the disciplinary context, including the Hernandez case, including the Boehne case, including the Moe versus Seton Hall case, and including others, Your Honor, all of those say the same thing. They all talk about that there is a difference between academic and disciplinary. Even going back to Napolitano, the first kind of New Jersey case to kind of address these issues, even that talks about the academic versus the disciplinary. And what they seem to say is in both contexts, it is kind of a quasi-contractual format, but you give a more deference in the academic than on the disciplinary side. But what Hernandez and others say is that in both contexts, what you need is notice of the charges, an opportunity to present your case in some format to the decider, and that's really what you need, an opportunity to review the evidence. And what Hernandez also says, Your Honor, is there's a little bit of a distinction between the secondary school and the university, but all they say there is in the university context, you need substantial evidence in addition. But Hernandez is in the discipline context, and the other cases I refer to are as well, and they don't take on, they're all involving the single investigator model, and none of them have live cross-examination, and in all of those cases, the process will sound to be more than abundant. Is the defendant's opportunity to examine evidence the same thing as his opportunity to examine the evidence as summarized by the university? Well, the only thing that was summarized by the university is the witness statements as opposed to the others, but I think, Your Honor, if you compare the fact pattern in Hernandez, in Mitra, and in the other cases, that's more process than was allowed for in those situations. For example, in Hernandez, Your Honor, the student was brought in to, this was a high school situation, the student was brought in to the principal, and not until that meeting was he even notified of the charges, and the evidence was summarized for him by the principal, and in that same meeting, he was told that he was going to be expelled. Now, he then had an opportunity to appeal to the principal, and he submitted additional evidence. He requested a live hearing from the principal, which was denied. But there was far less process in Hernandez, and in most of these other cases, than we have in the Princeton case, Your Honor. Thank you. Back to your point about Title IX, I think you make a good one, that a lot of these, or all of these, would end up in federal court, if that's the standard. But I'm wondering if that's sort of the necessary implication of the law. I mean, Title IX is a federal law, right? It is a federal law, Your Honor, but I don't think it is the necessary implication of the standard. I think you still have to have a plausible inference overall of sex bias as the reason. And I think to have that, you have to have more... The only way you know that is to marshal evidence. You're not going to know, bias involves motivation, I think we can agree, right? So we want to know whether Doe's biased, or whether Roe's biased, or whether Crotty, or Meg's, or whether any of these 16 witnesses had a motive to have, you know, support a friend, or attack an enemy, all of those motivations that one might have. You don't know any of that until you do discovery, and you look at their text messages, and you look at their voicemails, you know, whatever evidence you can garner. You don't know what's there until you do discovery, do you? Well, two things, Judge Hartman. First, you don't need to dive into the entire record and redo the trial. That is not what the court should be doing. Number two... No, but that's what courts do. I mean, that's what parties do when they're litigating cases. They dig into the evidence, right? What you're saying is, trust us, you don't need to look at the private text messages between any of these witnesses, you don't need to look at anything other than what the panel already looked at. Well, what I'm saying is there's two different categories. The private text messages, the videos, the 16 witnesses, I mean, that has nothing to do with whether the university was biased in its investigation. That's... Well, it could. I mean... That's what we do, right? I mean, I understand your point is saying we're going to... There's perfectly plausible explanations for all of this in the report, perhaps, but there's also perfectly... It would seem that there's a possibility to look at these as perfectly pled allegations that call into question that evidence. So perhaps you are right, but I think Judge Hartman's point is, doesn't that weighing function come later, not now? Well, Your Honor, what I'm saying is two different things. One is, as to the witnesses and the massive evidence that was considered by the panel, that does not go to whether the university was sex biased. That's not university conduct, whether a friend of Rose lied or a friend of Rose lied. Well, now I have to answer my own question. He didn't do a good job. No, no, here's why I think it might. These regimes that your client and I think almost all the other ones set up, they don't involve live cross-examination. They don't come with the trappings of testing the facts and the evidence of a courtroom. And I understand that. It's not a court, it's a university, right? It's a private relationship. Right. And that private university should be able to set up whatever rules it wants for its students, right? And if the students don't like the rules, then they shouldn't go to school there. But there's a federal law, Title IX, that says when you administer those rules, you can't treat people differently based on sex, right? So if the regime is set up in such a way that, you know, you can't treat people differently based on sex, right? All accusers are to be believed, whether, you know, you could have all male accusers. And if the regime is set up that there's this huge presumption in favor of the male accuser that he's telling the truth, and there's not a presumption that the female accuser is telling the truth, then you've got a Title IX problem, right? I think if you are assuming the truth based on sex, then you have a Title IX problem. But that is demonstrably not the case here. But moreover, as to the university's conduct, what I would say is, yes, sometimes you have to get into discovery, but sometimes you can accept the facts as pled, and you assess the facts as pled and see whether there's enough there. And if we were in a different context, Your Honors, if someone came into the DA's office, and male or female, and they said I was the subject of a rape, but, you know, I'm not sure if I want to pursue this. The DA may well likely would, almost certainly would, encourage that person to come forward. Now, next door, in the other room, his fellow DA is talking to someone who says, you know, I saw, you know, Tom Smith jaywalk. And the DA is like, okay, you know. And he doesn't encourage them. Now, those are not equivalent situations. Well, and that's what's so interesting about this case is that I can't unring the bell of what's in that report. What's in the report appears to have really damning admissions by Doe. And the allegations Roe makes against Doe appear on the record to be remarkably more severe than the counter allegations that Doe makes against Roe. That's all there. But what's hard about that is, you know, I used to be a trial lawyer, I used to be a trial judge, I'm not anymore, and I feel like I'm being asked to play, you know, trial judge here, and that's not what Rule 12 is about. Whether someone has stated a claim. And they have to have stated a plausible claim. Right. And in those remarkable. So why is this implausible? Is this implausible just because there's a mountain of evidence against Doe? And it's a rational conclusion that he was responsible on five of these six charges, or four of the five charges? I think all of that's true, but I don't think that's why I'm saying it's implausible. What I'm saying is implausible is that Doe came in to not even the DA, but to like a social worker. You know, he came in to his director of resident life and talked about something that was maybe not as serious. Not jaywalking, but in a totally different category than someone walking into the DA and saying I was raped and I'm not sure if I want you to investigate. And that's number one, and number two, you combine that with all of the facts alleged in the complaint, including that all of the things that Doe asked to be investigated were investigated. And the university came back to him and they said. Because there's no allegation to the contrary. And because in the notice he is solicited, yes, at a later date, but he is solicited, is there anything else? Are there any other facts or circumstances that we should be considering? Because these are the charges that we're going to investigate. Is there anything else? And he didn't come forward, he doesn't allege that he came forward with anything more. That's why I'm saying this isn't enough to rise to plausibility. And yes, he raises other issues, and in our brief, we beat down every single one of them based on the facts in the complaint. And that's why I'm saying you can always find some little thread somewhere, and every person will be able to plead a Title IX if this is enough for a Title IX. Thank you, Your Honors. Thank you, Mr. Kastenberg. We'll hear rebuttal from Mr. Bowen. Thank you, Judge. I want to go back to your question, Judge Hardiman, about the where in the complaint does it address the failure to look at the motivation to lie? Because there is a section that has a subheading that says failure to investigate motivation to lie, and that's paragraphs 101 to 103. So just so that's in the record. But that dovetails with the point I'd like to revisit based on my opposing counsel's arguments, and that is his argument that this is some tiny thread that anybody would Before you go off motivation to lie, I'm sorry, I've got to press that issue a little bit. Let's assume Roe had a motive to lie. It doesn't change the visual evidence, it doesn't change the documentary evidence where he's making these admissions. There are all kinds of declarations against interest. There's physical evidence here in terms of the photographs, et cetera. He tries to slough some of them off, and the panel didn't buy it. The panel said the bruises when he grabbed her at the reunion and she went to the ground, the panel made a finding of fact that that violence occurred. And his response was, no, I think it was during rough sex. I mean, how could that be sex discrimination when the panel makes a credibility determination on something like that? Well, the point there is that if the panel had considered her motivation to lie and the fact that she had directly threatened him that she was going to make false statements in order to get her away, that would have undercut her explanations of what happened. Now, her photographic evidence is also explained by the fact that they engaged in consensual rough sex. And that was part of the threat. Part of the threat was she said, all of these activities that we've engaged in for years, I'm now going to say were nonconsensual. And he knew that he couldn't deny that that had happened. It had happened. The only question was whether it was consensual or not, and that comes down to this issue of motivation or intent where you can only rely on somebody repeatedly to make those claims again if you wanted to. That doesn't cut it, because when he made the claims to an official of Princeton, to the person that was supposed to be his personal guidance counselor, that person said, forget it. There's nothing here. I think you need to go seek emotional help. So he was basically told, don't bother us with that. And that's, and again, it goes to the fact that we're at the pleading stage. If you draw the fair intention in favor. Did you plead the investigation was inadequate on his complaint against her? We plead it was nonexistent, that he made the complaint and it was ignored, that no action happened except he was referred to seek emotional counseling. No, not that complaint. No, his, that's different. His formal complaint. He filed a formal charge against her after she formally charged him. That's correct. Did you plead in the complaint that that formal charge was not adequately investigated? It wasn't adequately investigated, only because everything was one-sided. No, did you plead that? Yes. So where? Well, it's. You plead that they didn't adequately investigate? Yeah, we have a whole series of subheadings of the failures of the panel to consider different types of evidence to provide a fair process. Did you provide any evidence to the panel that the panel disregarded or failed to accept? Yes. What was it? The testimony of his mother, the testimony of his friend who saw contemporaneous injuries to him. And what testimony of the mother would have helped this case that the panel didn't consider? That she was with them on vacation and she saw the injuries to her son after her, Jane Rowe left the room and she came to the conclusion that those injuries had just been inflicted by Jane Rowe on her son. And that she was a violent and temperamental person. And she had spent time with him, they vacationed together. So it's not like the mother didn't know anything, she saw them together. In fact, the only witnesses who saw these two people together were witnesses for the plaintiff. And those witnesses, his mother and a male friend, were disregarded. I want to pick up on the same line of questioning. In your complaint, a couple of times you highlight and quote the two tweets, those two tweets. The first one, the finance bro, and the second one about boy problems that I created or something. Is your allegation that those tweets were not considered or that they were insufficiently considered? Or that they were handled improperly or something? Or is it that they weren't considered? Well, the first one was just discounted, your honor. It wasn't mentioned at all by the panel. The second one happened after the panel report, but it was brought to the attention of the appellate tribunal and it was, again, ignored. There was no mention of it. But in that tweet, it's significant because she does say, I made all this up. And now my quote-unquote boy problems are finally over. So there are tweets and text messages that go the other way that show that there was an effort by the female accuser to lie, to not tell the truth, and to threaten the plaintiff. My question is whether those tweets were considered. I guess we can't tell because the panel report doesn't mention them. So either they were considered and not deemed important enough to mention or maybe they weren't considered at all. I don't know what your allegation is, though. Well, in connection with that, in combination with everything else, our allegation is it shows that the panel did not do what it said it did. It did not impartially weigh the evidence. It slanted it against anything that was in favor of the male accused was ignored or discounted entirely. Now, some of it they refer to, some of it they don't, some of it they just ignore. Like the mother's testimony, they refer to the fact that the mother testified, but they say nothing about her testimony at all. So that's our allegation on that part. And just, I see that I'm out of time, but I just wanted to say one thing on the contract point, and this was Judge Porter's questions about the right to present his case and the right to see all the evidence against him. He didn't get that in this case. And now the New Jersey jurisprudence on these kinds of contract claims in the school, university, private university setting is identical to what's happening in Pennsylvania, except that it doesn't, there is no state court decision that addressed exactly what's going on. It's exactly this type of situation where there was a criminal, the conduct being alleged is akin to criminal conduct. There's just no state court precedent directly on point on that scenario, as there is in Pennsylvania. But this court's analysis and new sciences that went through what kinds of things go into fundamental fairness, and the fact that when you get to that kind of severity of outcome, you have to have more procedural safeguards, that's on all fours with what New Jersey says. In the Hernandez case, and in the Benny case, those courts also said the same thing. It depends on all the circumstances how much procedural due process should be afforded. And I submit to the court. That mean live cross-examination is required in some cases?  How do we know that? Who said that? Well, the Baum case in the Sixth Circuit said that, where when it really turns on credibility, because what happened always was behind closed doors between the accused and the accuser, you really need to be able to test. Part of the accused presentation of the case is going to be cross-examining the accuser and getting the kinds of admissions that you can only get from the defendant. And that's a challenge, right? I mean, the consequences are severe for your client, right? Yes. And there aren't the protections of a court of law. Yes. But what is this court supposed to do about that? That New Jersey law gets to control what the contractual relations are between Princeton and its students, right? But New Jersey law is forecasting exactly what this court ruled in U Sciences. And what all the other courts that have cited that decision are also saying, that when it comes to turning on credibility in cases of allegations of criminal offense, it's different in court in the sense that you could submit written questions based on real-time testimony that then gets vetted through some kind of review process by the panel so that there's no direct confrontation between accused and accuser. I understand that. On what? I don't know. It sounds like you're turning every university investigation into a court proceeding, and there's no authority for that. I agree, Judge, and I don't mean to suggest that, because U Sciences specifically says we're not talking about a full dress procedural due process safeguards. We're talking about minimal due process safeguards. And in U Sciences, it said at least a live hearing, and in some cases, live cross-examination, or some form of meaningful cross-examination. Why? I mean, it's not state action. Why are you entitled to due process at all if it's not state action? Because the jurisprudence in New Jersey is the same for these kinds of cases. It's like a quasi-contract, less strict. But there are three elements. One is the university has to follow its written procedures. The second is those procedures have to be fundamentally fair, given the entire circumstances. And then the third element, they have to show that they have sufficient evidence for the outcome. So we're focused on fundamental fairness. And the procedures, just as in U Sciences, the university there argued that, look, we followed our procedures. That means, by definition, it was fundamentally fair. And this court said, no, that's circular. Fundamental fairness depends on some well-worn concepts of fairness and due process that are endemic in common law and in the federal common law. And this court sided to those cases. So we're saying the same thing. And fundamental fairness, when you're accusing somebody of basically violence, assault, violent sexual assault, or just violent assault, it's a crime. You had your client was able to file a charge. You had a hearing in front of three arbiters. You had a right of appeal. But you had the right to marshal evidence and present witnesses. What's missing from the fundamental fairness calculus? Well, along the lines of... Going along with Judge Porter's questions to my adversary, what was missing was an opportunity to present the case. Because the way an accused in the circumstances like this... What did you want to do to present the case that he didn't let you do? A live hearing. Hearing what the accuser had to say and confronting her in some meaningful way, not necessarily by direct examination, but in a live setting, confronting her with her threats against him and the fact that she had lied about what she was going to say. And the fact that they had engaged in this kind of consensual choking, consensual choking and hitting and bruising and scratching, that that was part of their life together. That confrontation never happened. So there was never an ability to present that case, because that could only happen through questioning her. The questioning of her happened behind closed doors. He didn't even see a transcript. All he got was a summary. So again, Judge Porter asked the question, was that enough to see, you know, what the evidence was against him? And our position is it was not. And again, we're not asking, just as in you sciences, we're not asking for full dress criminal due process, but we are asking for minimal. That's pretty close to it, what you just asked for. A live hearing. Right. The only thing I heard you say that wasn't a full court hearing was you stopped short of live confrontation of the witness. Well, yeah, directly between an advisor or between the party himself. It could go through the panel with the written questions. But the point is, Judge, is that that's what this Court ruled in you sciences. That's what Baum said. When it turns on this kind of credibility contest, you do need to have a live proceeding. And I would submit to this Court that all of the decisions after you sciences that are citing you sciences are coming out the same way. The universities, by the way, in response, are establishing live proceedings as part of these Title IX processes. So that gets to the point that my adversary was making when he said this is just going to open the floodgates to federal litigation. Not if the university is providing live hearings and providing some form of meaningful cross-examination, which is not writing letters, questions cold and submitting it even before you have any idea what your accuser is saying about you and closing doors. That's not cross-examination. That's proposing questions. But that's not cross-examination. So if you look at what you are you asking us to establish a precedent that fundamental fairness requires some form of meaningful cross-examination in these cases? Only in these types of cases where there's serious misconduct. What's these types of cases? Allegations akin to criminal offenses and where the credibility of both the accused and the accuser are dispositive. And even the photographs and stuff like that, those are only corroborative if you believe what the witnesses are saying about what those photographs represent. No one saw this except the participants. Just one question. Did you also raise an allegation regarding the investigator-only model? Yes, we did. So you see that as being a breach of the contract and the good faith claim as well? Under the fundamental fairness or under the good faith and fair dealing claim. Yes, Your Honor, we do. Because again, that conflates the people who conducted the investigation are now adjudicating whether or not their investigation was done appropriately and fulsomely. And that's just, I mean, there's a reason why we bifurcate prosecutors from adjudicators. Just one other thing. Fundamental fairness. Again, we've got to be careful because we're trying to predict what New Jersey law says on that, right? We're not speaking for ourselves on what's fundamentally fair. We're speaking for what New Jersey has said or would say on the matter, right? That's correct, Judge. And my point is they have said it in Hernandez and Benet and even in the Seton Hall case. They've used it as a measuring stick, but they haven't really told us what it means, right? Correct. And they say it depends. What they did in Hernandez in the high school case and what they did in Benet and what they did in Seton Hall, they explicitly say that only applies here. We don't know what other safeguards would need to be put in place for more serious situations. Because none of those fact patterns come anywhere near this one. Judge Porter, do you have any other questions for Mr. Bowen? No, thank you. All right, the Court thanks Mr. Bowen and Mr. Kastenberg for the excellent briefing and argument. We will take the matter under advisement. We also understand there are some motions pending that we'll deal with in due course. Thank you.